THIS DISPOSITION IS
CITABLE AS
PRECEDENT OF THE TTAB

Oral Hearing:  June 9, 2005          Mailed:  January 10, 2006


## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

Standard Knitting, Ltd.
v.
Toyota Jidosha Kabushiki Kaisha

_____

Opposition No. 91116242

_____

John F.A. Earley III of Harding, Earley, Follmer & Frailey for Standard Knitting, Ltd.

David J. Kera of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. for Toyota Jidosha Kabushiki Kaisha.

_____

Before Walters, Holtzman and Kuhlke, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Toyota Jidosha Kabushiki Kaisha (applicant or Toyota) has filed an application to register the mark TUNDRA on the Principal Register for "automobiles and structural parts thereof" in International Class 12.[1]

_____

[1] Application Serial No. 75493787, filed on June 1, 1998, based on an allegation of a bona fide intention to use the mark in commerce.

On January 12, 2000, Standard Knitting, Ltd. (opposer or Standard Knitting) filed an opposition to registration of the above mark. In the notice of opposition, opposer alleges that since 1969, long prior to the June 1, 1998 filing date of the involved application, opposer has used the mark TUNDRA in interstate commerce in connection with the sale of clothing. Opposer also alleges that it is the owner of the following registrations:

> Registration No. 2268109 for the mark TUNDRA for men's, ladies' and children's clothing, namely, sweaters, hats, jackets, coats, t-shirts, vests, and shirts;[2] and
>
> Registration No. 2268110 for the mark TUNDRA SPORT for men's, ladies', and children's clothing, namely, sweaters, hats, jackets, coats, shorts, t-shirts, vests and shirts.[3]

Further, opposer alleges that it is the owner of two applications filed on May 14, 1997, one for TUNDRA (Serial No. 75291854) and the other for TUNDRA SPORT (Serial No. 75291853);[4] and that applicant's mark so resembles opposer's marks, as to be likely, when applied to applicant's goods, to cause confusion.

---

[2] Issued August 10, 1999 with claimed dates of first use and first use in commerce in 1969.

[3] Issued August 10, 1999 with claimed dates of first use and first use in commerce in 1994. The word SPORT is disclaimed.

[4] Both applications were filed on the basis of a bona fide intention to use the mark in commerce. Application Serial No. 75291854 was subsequently abandoned. Applicant filed a statement of use in Serial No. 75291853 on February 3, 2000, asserting dates of first use and first use in commerce in 1994. The application subsequently issued as Registration No. 2408997 on November 28, 2000. The word SPORT is disclaimed.

Applicant, in its answer, has denied the salient allegations in the opposition. In addition, applicant asserted counterclaims on March 24, 2000 which, as subsequently amended on April 24, 2001, seek to cancel the pleaded registrations and Registration No. 2408997 which issued on November 28, 2000 from pleaded application Serial No. 75291853, on the ground of fraud, or in the alternative to restrict the three registrations.

In particular, as to Registration No. 2268109, applicant alleges that the mark TUNDRA was not used in commerce in connection with any of the identified goods, other than possibly men's sweaters and shirts, when the underlying application (Serial No. 75291872) was filed on May 14, 1997; that specifically, opposer was not using the mark TUNDRA on the identified children's clothing as of the filing date of the application; that the mark was not used continuously since the claimed date of first use in 1969; that the application was signed on May 5, 1997 by Michael Wang as president of opposer; and that Mr. Wang signed the declaration reciting the identification of goods that included articles on which the mark had not, and was not, being used with knowledge of the falsity of the material representation that the mark was being used on all of the goods identified in the application.

In a similar charge with respect to Registration No. 2268110 for the mark TUNDRA SPORT, applicant asserts that the mark TUNDRA

3

SPORT was not used in commerce in connection with any of the identified goods, other than possibly men's sweaters, when the underlying application (Serial No. 75291873) was filed on May 14, 1997; that the mark was not used continuously since the asserted date of first use on December 31, 1994; that specifically, the mark was not used on the identified children's clothing as of the filing date of the application; and that Michael Wang signed the declaration of the application with knowledge of the falsity of the material representation that the mark was being used on all the goods identified in the application.

With respect to Registration No. 2408997 for TUNDRA SPORT, applicant alleges that the underlying application (Serial No. 75291853) which was based on a bona fide intention to use the mark in commerce, identified goods on which opposer was not using the mark as of the February 2, 2000 filing date of the statement of use; that the mark was not used at least on the children's clothing and on some or all of the listed goods for men and women when the statement of use was filed; that the statement of use was signed by Ross Yarnell, secretary of Standard Knitting, with knowledge of the falsity of the material representation that the mark was being used on all the goods identified in the statement of use.

In the alternative, applicant alleges that the respective marks have never been used in commerce in connection with any of

4

the goods listed in the three registrations except possibly men's sweaters and shirts in Registration No. 2268109; men's sweaters in Registration No. 2268110; and men's and ladies' mitts, skirts, pants, dresses and scarves in Registration No. 2408997; and that the registrations should be restricted accordingly.

Opposer in its answer denied the allegations in the counterclaims.

The record includes the pleadings; the files of the involved application and registrations; and testimony and other evidence filed by the parties. Opposer has introduced the testimony (with exhibits) of opposer's chief operating officer, George Groumoutis, taken on July 26, 2002 and on January 14-15 2003; and notices of reliance on materials including status and title copies of its pleaded registrations and the registration issuing from its pleaded application; and applicant's responses to certain discovery requests. Applicant has submitted the testimony (with exhibits) of Kevin Higgins, national truck advertising manager of Toyota Motor Sales, U.S.A. (applicant's subsidiary); Ernest Bastien, corporate manager for the vehicle operations group of Toyota Motor Sales, U.S.A.; Joseph M. Husman, business strategy manager of Toyota Motor Sales, U.S.A.; the stipulated testimony of Norman Bafunno, vice president of production and quality of Toyota Motor Manufacturing Indiana (applicant's subsidiary); and the stipulated testimony (with

5

attachments) of Dawn Ziebarth, customer loyalty manager-analysis and reporting of Toyota Motor Sales, U.S.A. Applicant has also submitted a notice of reliance on opposer's responses to certain written discovery requests and portions of the discovery depositions of opposer's chief operating officer, George Groumoutis taken on January 15 and 16, 2002; opposer's president, Michael Wang; and opposer's secretary, Ross Yarnell.

Both parties filed briefs and an oral hearing was held on June 9, 2005.

## EVIDENTIARY MATTERS

Applicant has objected to opposer's (first) notice of reliance on Registration No. 1604765 for TUNDRA TEX, a registration that was neither pleaded in the notice of opposition nor tried by the parties. The objection is well taken.[5]

Applicant has also objected to opposer's (second) notice of reliance as improper rebuttal. The objection is overruled as to the articles from the Lexis/Nexis database, and is sustained as

---

[5] Mr. Groumoutis, during his discovery deposition referred to that registration in deciding whether it was appropriate to include the goods identified therein in another application. The registration was not introduced for the purpose of trying any matters relating to the registration itself, nor did the parties do so. We do not consider the registration of record.

In addition to its pleaded registrations, opposer's notice of reliance includes a status and title copy of what appears to be a third-party registration of TUNDRA for luggage, backpacks and tents which opposer has not addressed in its brief. Opposer has not explained what this registration pertains to or why it was submitted, and it accordingly will not be considered.

to the third-party registrations and printouts from the eBay website. This evidence was not submitted for the proper purpose of denying, explaining or discrediting applicant's case but instead was clearly an attempt by opposer to strengthen its case-in-chief. See The Ritz Hotel Limited v. Ritz Closet Seat Corp., 17 USPQ2d 1466 (TTAB 1990). The evidence is of precisely the same type and has been submitted for the same purpose as the evidence submitted by opposer in support of its main case, i.e., to show purported use of the same marks on automobiles and clothing.

Applicant has submitted a statement of objections, to which opposer responded, challenging a substantial portion of the evidence adduced during the testimony depositions of Mr. Groumoutis taken on July 26, 2002 and January 14-15, 2003. We have addressed some of these objections below. Other objections, including some of those objections going to the weight of the evidence rather than its admissibility, will be addressed as an issue relating to the particular evidence is discussed. Unless otherwise noted, the referenced objections pertain to the July 26, 2002 deposition.

**Exhibits 2, 4, 5** (TUNDRA line books and brochures from 2001). The objection is not well taken. Mr. Groumoutis's knowledge provides a sufficient foundation for the brochures. Further, applicant did not maintain this objection with respect to the subsequent introduction of similar exhibits. On the other hand, there is no evidence as to whether and to whom these brochures

were ever distributed and they are therefore of limited probative value.

**Exhibit 19** (catalogue of TUNDRA accessories from 2002 of opposer's alleged licensee, Arden Leather Company).  The objection is sustained.  Although copies of all license agreements were requested by applicant, a copy of this license was not produced.  Opposer does not dispute that this document was covered by a discovery request or that it was not produced. Applicant's objection to the testimony (at 248) regarding the Mansack license agreement, which was admittedly not produced during discovery, is sustained.

**Exhibit 36**.  Applicant's objection to the introduction of a TUNDRA TEC hang tag is sustained insofar as opposer is attempting to introduce evidence on an unpleaded mark.

**Exhibits 51, 52, 56, 58-60** (spec sheets from 1993-2001) and **Exhibits 100-333** (January 14-15, 2003 deposition; spec sheets from 1987-2001, and invoices from 1993-2002).  The objection on the ground that the documents were not produced during discovery is not well taken.  The objections as to Exhibit Nos. 51, 52, 56, 58-60 were subsequently withdrawn during the deposition.  As to Exhibits 100-333, applicant did not specify the document requests that were allegedly not satisfied.  Further, opposer has sufficiently shown that the document requests had only asked for spec sheets and invoices covering certain years, and Mr. Groumoutis testified that opposer had produced all the spec sheets and invoices requested for the designated years.[6]

Opposer's remaining objections to this evidence are addressed later in this section.

**Exhibits 62, 63, 64** (TUNDRA brochures, undated).  The objections to these exhibits are sustained.  Exhibit 62 is a brochure identified as featuring a John Elway sportswear collection by opposer for which no date has been provided or can be ascertained.  Although Mr. Groumoutis states that it was, or would have been, handed out at trade shows there is no indication as to when that occurred.  Exhibit 63 is a brochure which appears on its face to be distributed only in Canada and which was

---

[6] However, opposer's contention that the requests asked for "representative samples" of such documents has not been supported as a copy of the disputed requests have not been made of record.  Therefore, applicant's objection to Mr. Groumoutis's testimony that these are only a sample of some of the invoices in existence, on the basis that they were not all produced, is sustained.

identified by Mr. Groumoutis as dating back to the 1970s before Mr. Groumoutis's employment with the company. Opposer has not provided sufficient foundation for its introduction and, in any event, it is unclear from the testimony whether this brochure, or one like it, was distributed in the United States. Exhibit 64, identified by Mr. Groumoutis as dating back to the 1970s, predates his arrival at the company and Mr. Groumoutis was unclear about whether it was actually distributed at trade shows.

**Exhibit 67** (advertisement in *Sedona Magazine*, 2001 issue). The objection to this exhibit is overruled. Mr. Groumoutis initially mischaracterized the exhibit as an advertisement placed by opposer but later clarified the source as a co-op advertisement that was placed by one of opposer's customers and approved by opposer.

**Exhibit 68** (TUNDRA brochure, undated). Applicant's objection on the basis of lack of foundation is overruled. Although the brochure was initially insufficiently identified, applicant did not maintain the objection after Mr. Groumoutis further identified the brochure as "post 1978" and explained the time frame of the brochure based on the current address of the manufacturing plant, his recognition of one of the sales representatives whose name was listed on the back of the brochure, and the types of product sold in the catalogue. On the other hand, the brochure is virtually of no probative value in showing early use of the mark.

**Exhibit 69** (articles and advertisements in *Style Magazine* with various 1999 dates and an invoice for one of the ads; and an advertisement from *Western Garment Industry and Wholesale,* marked 1968). The objection for lack of foundation as to *Style Magazine* is overruled. However, the magazine is, on its face, a Canadian publication, and it is unclear whether the publication was distributed in the United States. The objection for lack of foundation as to *Western Garment Industry and Wholesale* is sustained. In any event, it is clear that this magazine is, too, a Canadian publication and, again, there is no testimony that it was distributed in the United States.

**Exhibit 70** (article in the *New York Post*, undated). This article, which is a write-up about opposer's Tundra retail store in Manhattan (in existence from 1999-2001), is only admissible for what it shows on its face.

**Exhibits 79, 80 and 81** (photographs of a cap, t-shirt, and shirt, respectively, all bearing "TOYOTA TUNDRA"). Applicant's objection to these exhibits for lack of foundation are sustained. Mr. Groumoutis instructed his sales representative to go to "a Toyota dealership in Seattle" and "see if they can find these." (Test. at 177). Exhibit 82, the invoice for these purchases, is also excluded and does not serve to provide a foundation for the photographs. Further, this type of invoice, generated solely for purposes of litigation is not, as opposer claims, a regularly kept business record. In addition, applicant's admission in response to discovery that the dealership sells clothing, does not overcome the objection.

**Exhibit 93** (article appearing on just-style.com, a third-party website); **Exhibit 94** (*The Licensing Book*, March 2002 issue), and **Exhibit 95** (cover for *The Licensing Book*); and **Testimony at 167 and 175**. The objection to Exhibit 94 on the ground of hearsay is sustained. This publication is not admissible for the truth of the matters shown therein, and cannot serve opposer's purpose of proving that "Jeep consumer products has expanded with Old Toledo brands" or of proving any other asserted matters regarding this company's licensing activities. To the extent opposer is relying on this evidence to show the source of Mr. Groumoutis's knowledge about licensing, it is admissible. However, the evidence fails to qualify Mr. Groumoutis as competent to testify about the licensing activities of particular companies. Applicant's objection to Exhibit 93, an article purporting to show the affiliation of clothing designers with automobile companies, is sustained for the same reason. Exhibit 95 which is a cover for the front of *The Licensing Book* is not admissible to show that the company identified thereon is the worldwide licensing agent for Jeep. As to the testimony at 167, Mr. Groumoutis's discussions with licensing agents is inadmissible hearsay. Regarding the testimony at 175, Mr. Groumoutis is not competent to testify about the alleged licensing activities of Jaguar, and his testimony about his personal knowledge of a product allegedly licensed by Jaguar will not be given any weight.

**Exhibits 96 and 97** (Jacobson's catalogue, 2001; Bachrach catalogue, August 2001). These exhibits have been sufficiently identified as a catalogues of department stores and are admissible to show that opposer's garments are displayed in the catalogues. There is no evidence that the catalogues were distributed, however, and therefore the evidence is entitled to little weight.

**Exhibits 98 and 99.**  Correspondence between counsel for the parties is inadmissible hearsay.

**Testimony at 188, 189, 190, 251, and 266** (regarding activities of Tundra Knitwear).  Applicant has not provided a specific explanation for this objection in its statement and, in any event, has itself relied on this evidence throughout its case.

**Testimony at 195.**  Mr. Groumoutis's testimony that opposer's products appear in Norm Thompson catalogues is admissible, however, his hearsay testimony regarding the distribution of the catalogue is not.

**Testimony at 129.**  Mr. Groumoutis was not employed by opposer until 1991.  His testimony regarding first use of the mark TUNDRA in 1960s "based on discussions" with others in the company is inadmissible hearsay.  What a witness represents as his knowledge must be based on personal observation or authenticated business records rather than from hearsay based on the reports of others.

**Objections based on leading questions relating to both the July 2002 and January 2003 depositions:  Exhibit 21; Exhibits consisting of invoices and spec sheets; certain identified testimony.**  These objections go to the weight of the evidence and not its admissibility.  For the most part, we do not find the questions were leading but more an attempt to focus the attention of the witness on a particular issue.  Further, applicant has offered no explanation as to why specific questions should be considered leading.  However, to the extent that the questions are patently leading (such as counsel's question "Would you forecast that the advertising efforts of Tundra would grow?" (Test., July 2002, at 20)) the elicited testimony has been given little weight.

**Objections based on lack of foundation:  Exhibits 51, 52, 56, 58-60** (spec sheets from 1993-2001) and **Exhibits 100-333** (January 14-15, 2003 deposition; spec sheets from 1987-2001, and invoices from 1993-2002).  These objections are overruled.  Mr. Groumoutis has adequately established that these documents are records maintained by opposer in the ordinary course of business and that he is qualified to testify as to such matters.  In addition, there is nothing to indicate that the records are not trustworthy.

For purposes of context, spec sheets are generated from work orders and show that the garments were produced.  They are used to set up cost sheets which are necessary to establish prices for

shipping the garments.  Spec sheets are generated, prepared and maintained by the design department of Standard Knitting, and the overall responsibility for them and their approval falls upon the director of manufacturing, Dominic Sacco, or someone under his authority.  Each spec sheet contains a style number and each style number corresponds to a specific garment type.  The spec sheet describes the garment, and also identifies the mark that will appear on the garment, and where the mark will appear, i.e., whether on a neck label, hang tag, and/or packaging for the garment.

The invoices identify style numbers, customers, dates of sale, and quantities of goods sold.  While the style number appears on the invoice, the description of the garment sold does not.  However, as each style number corresponds to a particular garment type, the description of the garment can be ascertained from the spec sheet containing that style number.

The spec sheets and invoices are all admissible.[7]

**Objection for lack of foundation to summary sheets contained in Exhibits 51, 52, 56, 58-60.**  The summary sheets are lists of style numbers compiled by Gaylene Schroeder Nishimura, opposer's controller.  Although they may have been prepared under the authority and on instructions from Mr. Groumoutis they are hearsay and will not be considered.  The summary sheets are not compilations prepared in the ordinary course of business, although they were apparently derived from those records, but instead were prepared for purposes of litigation, not a normal activity of the company.  Ms. Schroeder, who prepared the summaries, was not called to testify as to the method used in preparing them or to authenticate or establish their accuracy.

We note that there are spec sheets for many, but not all of the invoices. Therefore, while all the invoices are admissible, in determining whether a garment was actually sold, those invoices for which there are no correlating spec sheets are of little probative value.

---

[7] However, we have disregarded the handwritten descriptions of the garments that appear on some of the invoices.  Those entries clearly are not part of the original documents but rather were filled in for purposes of this litigation.

**COUNTERCLAIMS FOR FRAUD**

We turn then to the counterclaims to cancel opposer's three pleaded registrations on the ground of fraud.[8]

As background, opposer, Standard Knitting, Ltd., is an apparel manufacturer. It is a Canadian company with its headquarters in Winnipeg, Manitoba. The clothing manufactured by opposer is sold in the United States and Canada and in other foreign markets. Opposer sells its clothing in the United States through its wholly owned subsidiary, Tundra Knitwear, Ltd. (Tundra Knitwear), a North Dakota corporation, and it licenses Tundra Knitwear to use the TUNDRA and TUNDRA SPORT marks.

George Groumoutis is the chief operating officer of both Standard Knitting and Tundra Knitwear. He joined Standard Knitting in 1991 as controller, where his duties included maintaining records of trademark registrations. He became vice president of finance in 1992 with the same duties. Subsequently in 1998, he became chief operating officer where he continued to maintain the trademark portfolio and was also responsible for the overall operations of Tundra Knitwear, that is, sales and marketing of the TUNDRA and TUNDRA SPORT clothing in the United States. Mr. Groumoutis reports to Michael Wang, the president of

---

[8] All references to the discovery deposition of Mr. Groumoutis are to the deposition taken on January 16, 2002, unless otherwise noted.

Standard Knitting and Tundra Knitwear since approximately 1993, and keeps Mr. Wang informed of trademark filings.

Mr. Groumoutis states that opposer prepares a new line of clothing twice a year, for the fall and spring seasons. Mr. Groumoutis, according to his testimony, has reviewed the entire product line of the company since 1999, and that prior to 1999, the line would have been reviewed by the design department headed by Dominic Sacco, Ian Rentz, the individual responsible for the Tundra Sport division of the company from 1992 to 1998, and Mr. Wang. According to Mr. Groumoutis, Mr. Wang still participates in the annual reviews and has done so since prior to 1994.

Mr. Wang signed the underlying applications for Registration Nos. 2268109 and 2268110 and had the authority to do so. Ross Yarnell, a director and the secretary of both Standard Knitting and Tundra Knitwear, signed the statement of use in connection with Registration No. 2408997. Mr. Yarnell was authorized to sign documents in Mr. Wang's absence.

**REGISTRATION NOS. 2268109 (TUNDRA) AND 2268110 (TUNDRA SPORT)**

In May 1997, Mr. Groumoutis received the applications for registration of the TUNDRA and TUNDRA SPORT from his attorney, John Earley. According to Mr. Groumoutis, the identifications of goods in the applications were not devised by anyone in opposer's office, and he did not recall giving a list of goods to Mr.

Earley to include and does not know where Mr. Earley got the list.  Mr. Groumoutis testified that upon receiving the applications he "would have done a cursory review" (Disc. Dep. at 108) "which might mean going through the pages, just looking to understand what, in general, is asked" (Disc. Dep. at 108-109) but he did not recall what specific paragraphs he read or did not read.  He did, however, indicate that he did not make any effort to confirm that the marks TUNDRA and TUNDRA SPORT were in fact then being used on each of the goods listed in the applications when the applications were filed, and that he made no effort to verify what goods were in fact then being sold, and sold in the United States, although he admitted that there were sources of documentary information that could have been consulted (possibly invoices, if not destroyed and if they could be located), or price lists and cost sheets, for at least some of the goods.

As support for his claim of current use on all of the identified goods, Mr. Groumoutis states that he "had personal knowledge or knowledge of looking at past brochures that they, in fact, had done those in the past" [the meaning of "done" in this context being unclear], and he indicates that some brochures would have been current, and some three or more years old. (Disc. Dep. at 133.)  At various points in his deposition, he states that he may have discussed the goods to be included in the applications with Mr. Sacco, and would have asked "have we ever

sold these goods" (Disc. Dep. at 201, 202) or have we made, or did we make these goods (Disc. Dep. at 164); or that he "may have spoken" to "say Mr. Rentz" to find out if the list was correct but "it may have been just general, are we using these, yes, we are, and that would have been the end of it." (Disc. Dep. at 124.)  However, when asked by applicant's counsel, "did you make any..." [then proceeding to list items of children's clothing], Mr. Groumoutis answered "not sure" as to children's sweaters, and "no" as to hats, jackets, coats, t-shirts, vests, shorts and shirts for children.  (Disc. Dep. at 91-92.)  When asked whether TUNDRA had been used at least as early as May 14, 1997 on hats, jackets, coats, t-shirts, Mr. Groumoutis initially stated that "some children under the age of 18 can actually wear the clothing that they make."  Later, having agreed that children's clothing is designed by size, not age, and using the example of a child who is between three and four feet tall, Mr. Groumoutis stated that opposer did not make sweaters, jackets, coats, t-shirts, or vests for children that size.  (Disc. Dep. at 77-79.)  Then, when asked about the use of TUNDRA SPORT on children's clothing, Mr. Groumoutis said that he was not sure about sweaters, but that opposer did not make hats, jackets, coats, t-shirts, or vests, shorts, shirts, mitts, skirts, dresses, tank tops, jogging suits, leisure suits, slacks, culottes, jump suits, blouses, scarves,

footwear, undergarments or sleepwear for children.  (Disc. Dep. at 90, 93.)

As to the statement of use, Mr. Groumoutis at first did not recall whether he reviewed it, but later says he would have looked at it and discussed it "with say" Mr. Sacco.  (Disc. Dep. at 197.)  He admits that opposer never sold any undergarments under the TUNDRA SPORT mark.  (Disc. Dep. at 194.)

When Mr. Groumoutis presented the three applications to Mr. Wang for his signature, Mr. Wang states that he read the applications and authorized their filing.  He testified that at the time of signing the applications, he was "personally aware" that Standard Knitting was selling sweaters, jackets, t-shirts, vests, and shirts in the United States under the TUNDRA mark, but that he did not personally know whether opposer was selling hats and coats under the mark.  (Disc. Dep. at 30-31.)  He also testified that to his personal knowledge at the time of signing, sweaters, t-shirts, vests, shirts were being sold in the United States under the TUNDRA SPORT mark, but that hats, jackets, coats and shorts were not.  (Disc. Dep. at 38-39.)  Mr. Wang states that Mr. Groumoutis,

> Told me that this was an application to register, I think it was to register our trademark.  I asked him, if he has read it.  And he said yes.  I asked him if it was accurate.  And he said yes.  And I signed it.  (Disc. Dep. at 40.)

17

Mr. Wang indicated that he did not look at any other documents in connection with the applications at that time and that the process took five minutes.

### REGISTRATION NO. 2408997 (TUNDRA SPORT)

The statement of use was delivered by fax from Gaylene Schroeder Nishimura, opposer's controller, to Mr. Yarnell for his signature. Mr. Yarnell stated that he was not acquainted with the trademark matters of Standard Knitting, that he was not kept apprised of trademark matters, and that he was not informed of the line of clothing sold by opposer under its marks in any detail. Mr. Yarnell states that he did not discuss the contents of the statement of use with Ms. Schroeder[9] and had no conversation with her about the accuracy of the statements. Mr. Yarnell states that he was not personally acquainted with the products on which the TUNDRA SPORT mark was in use in the United States. He indicates that he relied on the implicit assurance that the contents were accurate and that he made no effort to obtain independent confirmation of the accuracy.

### AMENDMENTS TO THE REGISTRATIONS

On April 24, 2001, after the opposition was commenced and the original counterclaims were filed, opposer filed proposed amendments to the registrations, not with the Board, but with the

---

[9] As opposer refers to Gaylene Schroeder Nishimura as "Ms. Schroeder," we will do the same here.

Post Registration section of the USPTO. Opposer sought to amend Registration No. 2268109 (TUNDRA) to delete hats, coats and t-shirts, and to limit the goods to "sweaters, jackets, vests, and shirts"; Registration No. 2268110 (TUNDRA SPORT) to delete hats, coats, shorts, and shirts, and to limit the goods to "sweaters, jackets, t-shirts, and vests"; and Registration No. 2408997 (TUNDRA SPORT) to delete all goods except "pants."[10]

In each amendment opposer stated that it "believes certain items...should either not have been listed, and/or should no longer be listed"; that registrant "had proceeded with information and belief when executing the [original application/statement of use]"; and that registrant "has since learned that it may have been mistaken about certain information which caused it to list certain items of goods which Registrant now believes should be changed."

When questioned about the use of the language, "should... not have been listed"/"should no longer be listed," Mr. Groumoutis explained:

> If we had evidence other than invoices, that would suggest that we actually made those wares, then we would consider it as should no longer be listed. If we had no evidence, not even invoice, or any other type of evidence that we ever did those, then it should not have been listed. (Disc. Dep. at 208.)

---

[10] The amendments were rejected by the Office as improperly filed and were ultimately abandoned.

This "other" evidence appears to have consisted essentially of "discussions" with other individuals in the company to see if the item had been "done" in the past, and if no documentary support for the items could be found, they were deleted. (Disc. Dep. at 211.) Although this explanation is quite confusing, Mr. Groumoutis had earlier stated that the decision to delete particular goods meant that the goods were not being sold in 1997 when the application was filed. (Disc. Dep. at 209.) Mr. Groumoutis admitted that under the TUNDRA SPORT mark, mitts and skirts "had never been sold" and that, except for pants, all of the goods in the '997 registration "should never have been" listed. (Disc. Dep. at 214, 220.)

In explaining why he included an overly expansive listing of goods in the registrations, Mr. Groumoutis said:

> Because we felt that we had been using that in the past, and a lot of time, ...the declarations that would come up to us for signature, we had made an assumption, that because they are coming from our law firm, and because they would have got it from somewhere, that they got to be accurate. There was cursory reviews done with the plant manager, did we make these, and he would say, yeah, we made them.

> What was not, in hindsight, in sitting here today, was that we did not suggest a timeframe when was it made, can, and, the other thing that we didn't do was, to who did we sell it to, and do we have invoices to support those things?...And hence, that's where the errors occurred, and why we filed an amendment about year ago. (Disc. Dep. at 165.)

And further that,

> Because we thought at that time that we had, because we had done it, we could have done it eight years ago, we could

20

have done it ten years ago.  We relied on, I relied on, on the director of manufacturing, his knowledge.  And that's why we did it.  (Disc. Dep. at 165.)

**DECISION**

Fraud in obtaining a trademark registration occurs "when an applicant knowingly makes false, material representations of fact in connection with his application."  Torres v. Cantine Torresella S.r.l, 808 F.2d 46, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986); Mister Leonard Inc. v. Jacques Leonard Couture Inc., 23 USPQ2d 1064, 1065 (TTAB 1992) ("Thus, according to *Torres,* to constitute fraud on the PTO, the statement must be (1) false, (2) a  material representation and (3) made knowingly.").  See also Medinol Ltd. v. Neuro Vasx Inc., 67 USPQ2d 1205 (TTAB 2003) ("A Trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false.").

Fraud must be proven with clear and convincing evidence, and any doubt must be resolved against a finding of fraud.  See Giant Food, Inc. v. Standard Terry Mills, Inc., 229 USPQ 955, 962 (TTAB 1986) and cases cited therein.  Furthermore, fraud will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true.  See Woodstock's Enterprises Inc. (California) v. Woodstock's Enterprises  Inc. (Oregon), 43 USPQ2d 1440 (TTAB 1997).

Mr. Wang and Mr. Yarnell each represented in a verified statement that the mark is in current use in commerce.

The critical question is whether the marks were in use in connection with the identified goods as of the May 17, 1997 filing date of the use-based applications and as of the February 3, 2000 filing date of the statement of use in the intent-to-use application.  If the mark was in current use, then the first use, even if false is not fraud.  See Colt Industries Operating Corp. v. Olivetti Controllo Numerico S.p.A., 221 USPQ 73, 76 (TTAB 1983) ("The Examining Attorney gives no consideration to alleged dates of first use in determining whether conflicting marks should be published for opposition.").

We first consider whether the statements of current use in the applications and the statement of use were false.

It is clear from the record that the marks were not in use on, at a minimum, most, if not all, of the items of children's clothing identified in each of the three registrations.  With the possible exception of children's sweaters, it is clear that no children's clothing was being sold in the United States as of the relevant dates of filing.

We further note that the invoices (dated 1993-2002) for which a spec sheet is associated, do not show sales of any items of children's clothing and further, no children's clothing is shown in any of opposer's catalogues or line books.  In fact,

contrary to opposer's contention, none of the documentary evidence of record substantiates any use of either mark in connection with children's clothing at any time, let alone as of the relevant filing dates.[11]

As to other items of clothing, Mr. Groumoutis admitted that the mark TUNDRA SPORT was never used on undergarments. Further, in opposer's responses to third request for admissions (nos. 36-45, 53, 57-72, 76-81) signed by opposer on December 21, 2001, opposer admitted that TUNDRA SPORT was not used in commerce as of the filing of the statement of use in connection with the following goods:

> men's, ladies' or children's mitts, ladies' and children's skirts, ladies' and children's dresses, men's, ladies' and children's tank tops, men's, ladies' and children's leisure suits, ladies' slacks, ladies' and children's jump suits, ladies' and children's blouses, men's, ladies' and children's socks, men's, ladies' and children's scarves, men's and children's neckwear, men's, ladies' and children's footwear, men's, ladies' and children's sleepwear, men's, ladies' and children's belts.

Thus, the statements that the marks were in current use in commerce on the goods identified in the three registrations were false. Moreover, the false statements were material to the issuance of the registrations. There is no question that the USPTO would not have granted registrations covering goods on which the mark is not being used.

---

[11] The evidence allegedly shows, according to opposer, that all of the listed products were actually made and/or sold.

We turn then to the question of whether opposer committed fraud when it signed the applications and statement of use declaring that the marks are in current use in commerce.

Mr. Wang, who signed the underlying applications for these registrations, did not personally know, at the time of signing, whether or not certain of the identified goods, specifically, hats and coats, were being sold under the TUNDRA mark in the United States. He also stated that to his personal knowledge hats, jackets, coats and shorts were not being sold under the TUNDRA SPORT mark in the United States. Mr. Wang relied on Mr. Groumoutis's representation that the applications were accurate. However, that representation turned out to be false.

It is opposer's contention that the false statement was the result of an honest mistake, and not due to any fraudulent intent; that opposer was making and selling a variety of clothing items; that the evidence, including invoices and spec sheets, shows that all of the listed products were actually made and/or sold by Standard Knitting, and substantiates the first use dates for each of its challenged registrations; that opposer did not know or understand the legal meaning of "use in commerce" and that its understanding of use was that the item was made or was sold; and that opposer had a reasonable belief, after making inquiries, that the marks were being used with the listed goods. As to the statement of use, opposer argues that it was filed on

24

the basis of a mistaken belief that use was being made; that Mr. Yarnell also had a belief that the mark was being used since it was received from Ms. Schroeder to be signed; and that the mark was in use with at least some goods as of the statement of use date.

Mr. Groumoutis's asserted mistake, assuming it truly was a mistake, was not a reasonable one. The language in the application that the mark "is now in use in commerce" is clear, and its meaning is unambiguous. It was not reasonable for Mr. Groumoutis to believe that if the items of clothing were ever made or sold, even if the last sale took place 20 years ago, it would support a claim that the mark "is" in use on the goods.[12]

Further, opposer's claim that the mistake was innocent is not credible. When Mr. Groumoutis was asked if he recalled ever being advised by any lawyer that in order to claim that a mark is being used in the United States, there has to be bona fide use in the ordinary course of trade, he responded "Not in those exact words, as you have indicated, but I understood it, that you had to have used the mark before you can place a registration on it" (Disc. Dep. at 142). Then, when asked, "When did you acquire the understanding that a mark had to be used in the United States?"

---

[12] Also, as a person who is familiar with the apparel industry, Mr. Groumoutis must have understood that "children's" clothing is not defined by age (under the age of 18 as he originally claimed) but rather by size.

25

Mr. Groumoutis answered "I guess in, when the first instance, in my dealings with trademark matters. ...After 1993." (Disc. Dep. at 142.)

Mr. Groumoutis clearly understood, prior to filing the applications, that "use" of a mark meant use in the United States. Given that none of Standard Knitting's clothing was made in the United States, Mr. Groumoutis could not have honestly believed that "use" simply meant that the goods were "made." This is not a situation where opposer misunderstood the significance of the statements it signed. Rather, opposer disregarded the significance.

Considering that Mr. Groumoutis did not personally know whether the marks were in use on children's clothing in the United States, he was obligated to inquire and to the extent he did inquire, by looking at prior registrations, relying on his attorney's representations, and asking Mr. Sacco and/or Mr. Rentz whether the goods were ever made or sold, those inquiries were grossly insufficient.[13] See *Medinol*, supra at 1209 ("Statements made with such degree of solemnity clearly are — or should be — investigated thoroughly prior to signature and submission to the USPTO.").

_____

[13] The case of Kingsdown Med. Consultants Ltd. v. Hollister, Inc., 863 F.2d 867, 9 USPQ2d 1384 (Fed. Cir. 1988) cited by opposer is not applicable here. See Minnesota Mining & Manufacturing Co. v. Shurtape Technologies Inc., 62 USPQ2d 1606 (DC Minn 2002) (providing that reliance on patent cases to resolve issues of trademark fraud is misplaced).

As to the statement of use, it is clear that Mr. Yarnell had no idea which, if any, of the listed items were being sold in the United States and that when Ms. Schroeder delivered the statement of use to Mr. Yarnell for signature she made no representations as to its accuracy. Mr. Yarnell signed the document stating that TUNDRA SPORT is used on children's clothing, among other items of clothing, when he knew or should have known that the mark was not being used on those goods. Opposer is charged with knowing what it is signing and by failing to make any appropriate inquiry, Mr. Yarnell signed the statement of use with a "reckless disregard for the truth." See *Medinol,* supra.

The specific or actual intent of Mr. Wang and Mr. Yarnell is not material to the question of fraud. As stated in General Car and Truck Leasing Systems, Inc. v. General Rent-A-Car Inc., 17 USPQ2d 1398, 1400 (S.D. Fla. 1990), "proof of specific intent to commit fraud is not required, rather, fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false."[14] See also *Medinol*, supra.

---

[14] It is important to note that the United States Patent and Trademark Office relies on the thoroughness, accuracy and honesty of each applicant. In general, the Office does not inquire as to the use of the mark on each good listed in a single class and only requires specimens of use as to one of the listed goods, relying on applicant's declaration with regard to use on the other listed goods. TMEP Sections 806.01(a) and 904.01(a) (4th ed. 2005). Allowing registrants to be careless in their statements of use would result in registrations improperly accorded legal presumptions in connection with goods on

We find that opposer committed fraud on the USPTO in procuring each of the three registrations. Accordingly the registrations will be cancelled in their entireties. Fraud cannot be cured by the deletion of goods from the registrations. See *Medinol*, supra.

If opposer should ultimately prevail in any appeal of this decision, we find in the alternative that the registrations would in any event require restriction. Based on the record, it is clear that certain goods must be deleted from the registrations. In this regard, we have also considered opposer's testimony that the items sought to be deleted by amendment should not be included in the registrations.

In addition to the deletion of goods, the record further shows that opposer would not be entitled to the 1969 date of first use of TUNDRA asserted in Registration 2268109. Mr. Groumoutis was not employed by the company until 1991 but he based that date on "discussions" with other employees, an undated advertisement appearing in a Canadian publication which Mr. Groumoutis identified as dating back to 1968, and a hang tag which he identified as being used since the 1960s. The discussions are hearsay, Mr. Groumoutis did not know whether the publication or the advertisement reached the United States, and

which the mark is not used.

28

it is unclear whether the goods to which the hang tags were applied were sold in the United States. The invoices (and associated spec sheets), the only competent evidence of early use, show sales of sweaters and shirts under the TUNDRA mark in 1993.[15]

Based on our review of the record, should Standard Knitting ultimately prevail on the issue of fraud, we find that the registrations should be restricted as follows:[16]

Registration No. 2268109 will be restricted to "men's and ladies' clothing, namely sweaters, vests, and shirts." The dates of first use in this registration will be changed to 1993.

Registration No. 2268110 will be restricted to "men's and ladies' clothing, namely sweaters, jackets, t-shirts and vests."

Registration No. 2408997 will be restricted to "men's and ladies' pants."

## LIKELIHOOD OF CONFUSION

As fraud only relates to the acquisition of the registrations, opposer is still entitled to rely on its common law rights in asserting its claim of likelihood of confusion in

---

[15] Opposer has stated in its brief that the Board may restrict the registrations to conform to the documentary evidence of record.

[16] We have construed applicant's claim that the marks have not been in continuous use on the goods as part of the fraud claim and not a separate abandonment claim. However, we have taken continuous use into account in determining the extent to which the registrations should be restricted.

Opposition No. 91116242

the opposition.  See Volkswagenwerk AG v. Wheeler, 814 F.2d 812, 2 USPQ2d 1264 (1st Cir. 1987).

In order to establish priority based on common law rights, opposer's burden is to demonstrate by a preponderance of the evidence proprietary rights in TUNDRA and TUNDRA SPORT for clothing prior to June 1, 1998, the filing date of applicant's intent-to-use application.  See, e.g., Eastman Kodak Co. v. Bell Howell Document Management Products Co., 994 F.2d 1569, 26 USPQ2d 1912 (Fed. Cir. 1993); and NASDAQ Stock Market Inc. v. Antartica S.r.l., 69 USPQ2d 1718 (TTAB 2003).

Prior common law rights in a mark may be established through use of the designation in connection with a product in commerce in a manner analogous to trademark use, i.e., through use in advertising, use as a trade name, or any other manner of public use.[17]  See Otto Roth & Co. v. Universal Foods Corp., 640 F.2d 1317, 209 USPQ 40 (CCPA 1981); and Jim Dandy Co. v. Martha White Foods, Inc., 458 F.2d 1397, 173 USPQ 673 (CCPA 1972).

The testimony shows that opposer's invoices represent actual sales of clothing in the United States, and that they identify customers in the United States to whom the goods were sold and the dates of such sales.  When the invoices are viewed in conjunction with the spec sheets that describe the garments and

---

[17] Opposer's reference to a family of marks in its brief, will not be considered as this claim was neither pleaded nor tried by the parties.

30

the mark that appeared thereon, we find the evidence sufficient to establish opposer's prior and continuous use in the United States of TUNDRA since 1993 and TUNDRA SPORT since 1994, in connection with clothing, including sweaters and shirts.[18]

Thus, we turn to the question of likelihood of confusion between applicant's mark TUNDRA for "automobiles and structural parts thereof" and opposer's marks TUNDRA and TUNDRA SPORT for clothing. Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue, including the similarities or dissimilarities between the marks and the similarities or dissimilarities between the goods. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

Applicant's mark TUNDRA is identical in sound and appearance to opposer's mark TUNDRA and virtually identical in sound and appearance to opposer's TUNDRA SPORT. The respective marks convey somewhat different meanings and commercial impressions in connection with clothing and automobiles. According to the dictionary entry supplied by the parties, the term "tundra" is

---

[18] Contrary to opposer's assertion, there is no evidence of prior use on leather products such as wallets, or accessories such as belts, and in any event common law use on such items has not been pleaded by opposer. Further, as indicated earlier, evidence regarding the unpleaded mark or registration for TUNDRA TEX will not be considered. Any references in opposer's briefs to that mark or to another unpleaded mark, TUNDRATEC, to which applicant has also objected, have not been considered.

31

defined as "a level or rolling treeless plane that is characteristic of arctic and sub arctic regions, consists of black mucky soil with a permanently frozen subsoil...." While TUNDRA as applied to clothing and particularly sweaters, suggests protection against the elements, TUNDRA for automobiles suggests the ruggedness of the vehicles or their suitability for rough terrain. It can also be seen that TUNDRA is not an arbitrary or fanciful mark in the context of opposer's goods but rather is suggestive of opposer's goods.

Opposer argues that its marks are strong, and have had "wide exposure," and that they are entitled to a broad scope of protection. According to the record, however, exposure of the TUNDRA and TUNDRA SPORT marks, if any, has been primarily to the trade, not to the ultimate consumer. Opposer testified that it advertises and promotes its clothing to the public through catalogues, over the Internet, in newspapers, magazines and cooperative advertisements, and through the use of its marks on packaging for the clothing and point of purchase displays. However, the extent of such advertising to consumers in the United States is unknown and cannot be determined from the record. There is for the most part no testimony as to whom or at least to what extent any clothing catalogues were distributed. Opposer has submitted an example of its cooperative advertising

32

from 2001 with no indication as to often such ads might have run or how many customers it might have reached.[19]

Mr. Groumoutis testified that "in some years" its advertising expenditures "could be anywhere from five to eight percent of our gross revenue" and that for the current year (presumably 2002) it would be "in the mid or upper mid six figures." (Test., July 2002, at 19.) This figure is unsubstantiated, but more important there is no indication as to whether or to what extent that figure reflects advertising in the United States and directed to consumers.

Mr. Groumoutis also testified that opposer sells its clothing to department stores and apparel shops in the United States such as J.C. Penney, Jacobson's, Dillard's, Target, and Marshall Fields and through catalogue companies such as Norm Thompson and Bachrach, and that opposer presently has about 1600 retail customers. He also stated that opposer's clothing was sold through its own retail store which was open for two years from 1999-2001. There is also evidence that in one instance opposer sold its clothing through the Green Bay Packers ProShop catalogue (2000-2001)[20] and also in connection with the 1994 World

---

[19] Other evidence consisting of catalogues featuring TUNDRA clothing worn by the sports figures John Elway and Bobby Hull, to the extent we can determine, were only distributed to the trade, not to the public, and possibly not in the United States.

[20] Applicant's objection to the Green Bay Packers catalogue (Exhibit 66) on the basis of lack of foundation is overruled. Mr. Groumoutis

Cup Soccer Tournament.  Again, however, there is no evidence of volume of sales generated from any of these activities.[21]

Opposer's testimony regarding the number of units sold annually[22] as of "right now" in the United States (Test. at 110, July 26, 2002) is not particularly meaningful without a context for that figure or a dollar amount to associate with it.[23]  Also, that figure represents the number of units sold to retailers, not to ultimate consumers.

In addition, there is no evidence that consumers were motivated to purchase opposer's TUNDRA SPORT clothing through the

---

testified from personal knowledge that the clothing shown in the catalogue is representative of the TUNDRA SPORT products that were specifically made by opposer for the Green Bay Packers to sell.  The letter "G" appears on the front of the items and they contain a TUNDRA SPORT neck label.  Although Mr. Groumoutis had nothing to do with the preparation of the catalogue itself and had no direct knowledge of its distribution, opposer provided information for the TUNDRA SPORT clothing that appears in the catalogue, and had personal knowledge that those particular products were for the most part sold through the catalogues and that they sold very well.  However, we agree with applicant that the testimony as to where, other than through the catalogue, the clothing was sold, is hearsay and lacking in foundation.

[21] Mr. Groumoutis testified during his January 15, 2002 discovery deposition regarding the number of catalogues distributed by one of opposer's customers but he could not identify the customer or the time period and did not identify whether it was a retail or wholesale customer.

[22] The actual figures are confidential and subject to a protective order.

[23] Opposer points to several invoices evidencing sales to the identified retail stores but we cannot possibly draw any meaningful conclusions about total sales from this evidence.  Opposer's unsupported assertion in its reply brief regarding the cost per unit of opposer's clothing has been given no consideration.  The portion of Mr. Groumoutis's discovery deposition which allegedly supports this assertion has not been made of record.

Green Bay Packers ProShop catalogue and in connection the 1994 World Cup Soccer Tournament by recognition of opposer's mark or anything other than the opportunity to wear clothing with a Green Bay Packers logo or a World Cup logo.

Opposer's evidence as a whole falls far short of establishing that TUNDRA and TUNDRA SPORT have achieved any degree of strength and recognition in the consumer market, or that opposer's mark is entitled to a broad scope of protection. In view of the suggestive quality of opposer's marks in connection with clothing, the marks are entitled to a more limited scope of protection than arbitrary or fanciful marks.

We turn then to the question of whether applicant's goods and opposer's goods are sufficiently related and/or whether the circumstances surrounding the marketing of the goods are such that purchasers encountering them would, in view of the similarity of the marks, mistakenly believe that the goods emanate from the same source. See Monsanto Co. v. Enviro-Chem Corp., 199 USPQ 590 (TTAB 1978); and In re International Telephone & Telegraph Corp., 197 USPQ 910 (TTAB 1978). Even if the marks are identical, if these conditions do not exist, confusion is not likely to occur. See, e.g., Nautilus Group Inc. v. ICON Health and Fitness Inc., 71 USPQ2d 1173, 1185 (Fed. Cir. 2004); In re Unilever Limited, 222 USPQ 981 (TTAB 1984); and In re Fesco, Inc., 219 USPQ 437 (TTAB 1983).

35

Opposer's clothing and applicant's automobiles are vastly different goods and opposer has failed to show that they are related. Despite any overlap in purchasers, there is no persuasive evidence that such purchasers would expect these vastly different goods to emanate from the same source.

Opposer argues that the goods are "inherently" related, contending that automobile manufacturers often use the same trademarks on automobiles and clothing; that it is common for automobile manufacturers to sell both automobiles and clothing and that clothing manufacturers use marks used for their clothing in connection with the sale of automobiles;[24] and that it is the practice of the automobile industry, including Toyota, to use the same trademarks on both automobiles and clothing.

In support of these contentions, opposer has submitted a number of third-party registrations of marks which, in each instance, are registered for both clothing and automobiles;[25]

---

[24] The cases cited by opposer, including Jaguar Cars, Ltd. v. Skandrani, 771 F.Supp. 1178, 18 USPQ2d 1626 (SD Fla 1991), cannot be relied on by opposer as proof of the facts found therein.

[25] Opposer introduced most of these registrations by notice of reliance. Several other third-party registrations, as well as two pending applications, were introduced during the testimony deposition of Mr. Groumoutis on July 23, 2002 as Exhibits 84-89. Applicant has objected to these exhibits on the ground of lack of foundation. In view of the purpose for which this evidence is offered, the objections are sustained. The applications/registrations are all admissible as official records of the USPTO, but only for what they show on their face. Mr. Groumoutis's testimony regarding the entities to whom the registrations were granted and his speculative and unsupported assertions as to the nature of their business activities will not be

companies; and evidence of applicant's purported sales of clothing under the mark TUNDRA.[26]

The relevant question is whether purchasers would perceive goods as diverse as clothing and automobiles as emanating from the same source. See Shen Manufacturing Co., Inc. v. The Ritz Hotel Limited, 393 F.3d 1238, 73 USPQ2d 1350 (Fed. Cir. 2004). Third-party registrations may have some probative value to the extent that they serve to suggest that the listed goods are of a type which may emanate from a single source. However, this

---

considered. Further, the applications are not proof of anything except that they were filed on a particular date. They are not proof, as opposer claims, that applicant herein is the owner of the applications.

[26] Opposer's additional evidence is either irrelevant or inadmissible for opposer's intended purpose. The Lexis/Nexis articles (submitted by notice of reliance) are hearsay as to Toyota's and/or any third-party merchandising activities. The third-party website materials (Exhibit 90, Buick.com, and Exhibit 91, Autos.Yahoo.com), introduced to show affiliations of clothing designers with automobile companies, have been properly authenticated and are admissible for what they show on their face. However, opposer has laid no foundation for offering reliable testimony about the companies identified in these materials or the purported business activities of those companies, the practice in the industry or that the public would be aware of that practice. Further, this evidence is not competent to prove, as opposer claims, that "Toyota may have a tendency to 'overwhelm' the senior user Standard Knitting." (Reply to Applicant's Statement of Objections at 7.) Opposer's request that the Board take judicial notice of the additional third-party website materials attached to its reply brief is denied. These materials are clearly not proper subject matter for judicial notice. See Michael S. Sachs Inc. v. Cordon Art B.V., 56 USPQ2d 1132 (TTAB 2000). Further, applicant objected to introduction of these materials at the oral hearing. Opposer's evidence that the Lexus division of Toyota Motor Sales, U.S.A. has used COACH (leather products) to promote some of its automobiles, although admissible (through applicant's responses to discovery requests) is irrelevant to the question of whether the parties' clothing and automobiles are related goods.

evidence is insufficient to convince us, as opposer claims, that its clothing will be perceived by consumers as emanating from or sponsored by applicant.  Third-party registrations are not proof of sales of the products shown therein; nor are they evidence that the marks shown therein are in use or that the public is familiar with them, or even aware of them.  See AMF Inc. v. American Leisure Products, Inc., 474 F.2d 1403, 177 USPQ 268 (CCPA 1973).

To the extent applicant itself offers clothing, the evidence shows that the clothing is marketed under TOYOTA TUNDRA, not TUNDRA alone.  In any event, there is no evidence in the record to establish that such goods typically emanate from companies that sell automobiles or that purchasers would naturally expect both products to emanate from the same source.

Opposer, citing Tuxedo Monopoly, Inc. v. General Mills Fun Group, Inc., 648 F.2d 1335, 209 USPQ 986 (CCPA 1981), and asserting the existence of reverse confusion, argues that "famous marks, like Toyota TUNDRA based on Toyota's boasted sales and advertising allegations are frequently used on clothing."  Reply Brief at 2.  An important factor in the *Tuxedo Monopoly* case was the fame of the mark ("...MONOPOLY may properly be termed a 'famous' mark. ...[I]t is a matter of common knowledge that famous marks are frequently used on items such as clothing...").  Supra at 988.  Obviously, a famous mark is more likely to be

38

associated by the purchasing public with a greater breadth of goods or services. See Dan Robbins & Associates, Inc. v. Questor Corp., 559 F.2d 1009, 202 USPQ 100 (CCPA 1979). It is clear opposer's marks are not famous. As to applicant's mark, the applied-for mark is TUNDRA, not "TOYOTA TUNDRA." The strength or fame of "TOYOTA TUNDRA" is not the issue in this case. To whatever extent fame has attached to the name TOYOTA, there is no showing that any such fame extends to the mark TUNDRA.[27]

Further, the parties' very different products are sold in completely different marketing environments. Opposer's clothing is sold through the customary channels for such goods such as apparel shops and department stores. Applicant's automobiles, on the other hand, are sold through automobile dealerships, not customary channels of trade for clothing. The marks for these goods would not be encountered by purchasers under marketing conditions that would give rise to a likelihood of confusion.

Opposer, however, argues that the channels of trade for clothing and automobiles overlap in that both parties market their products over the Internet.[28] In support of this

---

[27] Opposer argues that registration of TUNDRA for automobiles would wrongfully preclude opposer from expanding its TUNDRA name to automobiles as other clothing manufacturers have done. Among other problems with this argument, there is no persuasive evidence of any genuine intent by opposer to license its marks for use on automobiles.

[28] We see no support in the record for opposer's claim that applicant also markets its automobiles through professional sporting events.

39

contention, opposer has introduced printouts of pages from the eBay auction website showing that clothing and vehicles can both be found on the website.[29] First, while applicant may promote its vehicles over the Internet, Mr. Bastien has testified that applicant does not sell them over the Internet. Further, simply because automobiles and clothing may both be marketed over the Internet does not lead to the conclusion that the goods would emanate from the same source. The fact that opposer could enter the word "tundra" on the eBay search engine and pull up what appears to be a randomly ordered listing of hundreds of "tundra" goods, including cars and car parts, clothing, duck decoys, cereal bowls and underwater photo equipment,[30] is clearly not proof that all these goods move in the same channels of trade or that they would all be perceived as emanating from a common source. The evidence does not establish that clothing and automobiles are related or that their sale even under identical marks would be likely to cause confusion. See Champion

---

[29] Applicant has objected to this evidence (Exhibits 334 and 340). These exhibits have been authenticated but are only admissible for what they show on their face and not for the purpose of showing that they display opposer's and/or applicant's products. Mr. Groumoutis did not place the item(s) on the eBay website and did not know who did. As to Exhibit 334, applicant's objection based on opposer's failure to produce the documents in response to discovery is overruled as Mr. Groumoutis testified that he retrieved these documents only shortly before his testimony deposition.

[30] There is no explanation for the order of the listings.

International Corporation v. Genova, Inc., 199 USPQ 301 (TTAB 1978).

It is true that the purchasers of opposer's clothing are ordinary consumers and that those same consumers would also be the purchasers of applicant's automobiles. At the same time, however, it is clear that automobiles are expensive and would only be purchased after careful consideration, thereby reducing the risk of confusion.

Opposer's vague hearsay accounts of alleged instances of actual confusion are of no probative weight. Further, opposer has not explained how the records of telephone calls to applicant's company show any manner of actual confusion, and we find that they do not.

In view of the foregoing and our finding that opposer's marks are entitled to a more limited scope of protection than arbitrary or fanciful marks, and since opposer has provided no persuasive evidence that automobiles on the one hand and clothing on the other are related goods, the protection of opposer's marks should not extend beyond opposer's clothing to automobiles. Accordingly, we find that the contemporaneous use of the marks in connection with the respective goods is not likely to cause confusion.

**Decision:** The counterclaims for cancellation of opposer's registrations on the ground of fraud are sustained. Registration

41

Nos. 2268109, 2268110 and 2408997 will be cancelled in due course. The opposition on the ground of likelihood of confusion is dismissed.